IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No.  7:07-CV-203-FL(3)

ANTHONY MACON,                          )
     Plaintiff,                        )
                                  )
                   v.                     )
                                    )          **MEMORANDUM &**
                                    )          **RECOMMENDATION**
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
     Defendant.                       )
                                    )

This matter is before the Court upon the parties' cross Motions for Judgment on the

Pleadings [DE's 14, 15, 20, 21].    Plaintiff has also filed a response to Defendant's Motion

for Judgment on the Pleadings [DE-22].  The time for the parties to file any further responses

or replies has expired.  Accordingly, the matter is now ripe for adjudication. Pursuant to 28

U.S.C. 636(b)(1), this matter is before the undersigned for the entry of a Memorandum and

Recommendation.   For the following reasons, it is HEREBY RECOMMENDED that

Plaintiff's Motion for Judgment on the Pleadings [DE-14] be DENIED IN PART AND

GRANTED IN PART, and that Defendant's Motion for Judgment on the Pleadings [DE-20]

be DENIED IN PART AND GRANTED IN PART.

## Statement of the Case

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on July 1,

2004, alleging that he has been disabled since June 10, 2002 (Tr. 15).  This application was

1

denied initially and upon reconsideration (Tr. 15). A hearing was held before an Administrative Law Judge ("ALJ") on March 21, 2006, who found Plaintiff was not disabled during the relevant time period in a decision dated August 22, 2006 (Tr. 15-21). The Social Security Administration's Office of Hearings and Appeals denied Plaintiff's request for review on October 27, 2007, rendering the ALJ's determination as Defendant's final decision (Tr. 4-7). Plaintiff filed the instant action on December 21, 2007 [DE-4].

### Standard of Review

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## Analysis

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. 17). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) lumbar/cervical spine degenerative joint disease; 2) sleep apnea; 3) obesity;

4) hypertension; 5) venous insufficiency; and 6) a history of deep vein thrombosis (Tr. 17). In completing step three, however, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 18). Specifically, the ALJ noted:

> The record reveals a history of treatment for degenerative joint disese of the cervical/lumbar spine from Dr. James Markworth and Dr. Alan Jackson. The claimant has also been assessed with sleep apnea for which he is prescribed a CPAP machine. He suffers from high blood pressure, although he testified at the hearing that this condition is well-controlled with medications. The claimant also has problems with deep vein thrombosis and venous insufficiency for which he had been hospitalized and has been placed on Coumadin therapy.

> I have considered the condition of obesity as it relates to the claimant pursuant to the guidelines set forth in Social Security Ruling 02-1p. In the absence of evidence to the contrary, a diagnosis of obesity by a treating source or a consultative examiner is adequate to establish the existence of obesity as a medically determinable impairment. As with any other medical condition, obesity may be considered a "severe" impairment if it significantly limits an individual's physical or mental ability to perform basic work-related activities. The mere description of obesity as "severe," "extreme," or "morbid" does not establish whether obesity is or is not a "severe" impairment. Rather, I will do an individualized assessment of the impact of obesity on an individual's functioning when deciding where an impairment is severe. Such things as limitations in exertional functions of sitting, standing, walking, lifting, carrying, pushing, and pulling, as well as postural functions of climbing, balancing, stooping, and crouching may be considered. Also, the ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers, and the ability to tolerate extreme heat, humidity, or hazards may also be affected. Some people with obesity may develop sleep apnea which can lead to drowsiness and lack of mental clarity during the day. Fatigue may also affect the individual's physical and mental ability to sustain work activity.

> After a thorough review of the evidence of record, I find that the claimant's obesity has not had more than a minimal effect upon his ability to perform work activity beyond the residual functional capacity set forth below. While

the claimant has been assessed with obesity with an average weight of 250 pounds and a body mass index (BMI) of 33.9, the claimant does not have a body mass index of 35 or greater, which represents "extreme" obesity. According to the National Institutes of Health, it is individuals of "extreme" obesity who suffer the greatest risk of developing obesity-related impairments. Treatment notes reveal that the claimant despite his obesity, was able to move about generally well and sustain consistent function. Objective examination revealed normal gait with a straight back and the ability to walk on his tiptoes and heels. There is no showing that the claimant suffered from significant fatigue or heart disease. His blood pressure and sleep apnea are controlled by his prescribed treatment. The medical evidence also fails to indicate that the claimant's ability to manipulate has been negatively impacted. After a thorough review of the evidence of record, I find that the claimant's obesity has not had a negative effect upon the claimant's ability to perform routine movement beyond the residual functional capacity stated below or upon his ability to sustain function over an 8-hour day . . .

 . . .State Agency physicians reviewed the claim and failed to find that the claimant met any listed impairment. Moreover, the claimant does not allege the existence of any listed impairment.
(Tr. 17-18).

Based on these findings, the ALJ found that Plaintiff had the following residual functional capacity ("RFC"):

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light, unskilled work not involving concentrated exposure to extreme vibration.
(Tr. 18).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was not able to perform his past relevant work as a paper mill worker (Tr. 20). At step five, however, the ALJ found that there were jobs that Plaintiff could perform and that these jobs existed in significant numbers in the national economy (Tr. 20-21). Accordingly, the ALJ

5

determined that Plaintiff was not under a disability at any time through the date of her decision (Tr. 21). The evidence relied upon by the ALJ in reaching these conclusions shall now be summarized.

On April 3, 2000 Plaintiff was scheduled to undergo a Epidural Steroid Injection ("ESI") to treat his chronic lower back pain (Tr. 72). However, as the procedure began, Plaintiff's blood pressure and heart rate dropped (Tr. 72). Accordingly, Plaintiff decided to postpone the procedure (Tr. 72). Dr. Paul S. Chipley suggested "that perhaps an IV for his next injection would be reasonable" (Tr. 72). The ESI was rescheduled for April 27, 2000, and at that time Plaintiff tolerated the procedure well (Tr. 71). Plaintiff returned for another ESI on May 5, 2000 (Tr. 70). Prior to the injection, Plaintiff was examined by Dr. Thomas M. Dalton (Tr. 70). Dr. Dalton described Plaintiff as "moderately obese" (Tr. 70). A third ESI was performed on June 29, 2000 (Tr. 68). When Plaintiff was examined prior to his third injection, Plaintiff demonstrated normal motor and sensory function (Tr. 68). On August 1, 2000, Plaintiff stated that he was "not satisfied with his level of pain control" (Tr. 67). Dr. Dalton diagnosed Plaintiff with lower back pain, and expressed "doubt [that] facet neurolysis will improve his symptoms" (Tr.67).

Plaintiff was examined at Atlantic Orthopedics in Wilmington, North Carolina on August 21, 2001 (Tr. 74). He stated that he continued to experience back pain (Tr. 74). This pain had worsened after he stopped his physical therapy program (Tr. 74). However, Plaintiff also stated that stretching exercises helped his leg pain (Tr. 74). Ultimately, Plaintiff was informed that "[t]he actual answer for his problem remains surgical fusion" (Tr. 74). On

6

August 28, 2001, it was noted that Plaintiff had reached maximal medical improvement (Tr. 73). Furthermore, it was estimated that Plaintiff had an 8% permanent partial impairment of his back based on discogenic back pain (Tr. 73).

On January 18, 2000, Plaintiff underwent a MRI of his spine (Tr. 78). Plaintiff's symptoms were described as "[l]ow back pain with lower extremity radiation" (Tr. 78). The MRI indicated that Plaintiff's vertebral body stature and alignment were maintained throughout (Tr. 78). In addition, no focal disc herniation or significant stenosis was discovered (Tr. 78). However, degenerated discs were observed from the L2-3 through the L4-5 levels (Tr. 78). Ultimately, Plaintiff was diagnosed with lower lumbar spondylosis without focal disc herniation or significant stenosis (Tr. 79). On October 26, 2000 Plaintiff underwent a five level lumbar discogram (Tr. 75). It was noted that Plaintiff had a "[o]ne year history of low back spasm radiating to right upper buttock and right anterior thigh with a knot like discomfort . . . [and] [o]ccasional, isolated, unrelated right foot burning" (Tr. 75). A CT of Plaintiff's lumbar spine post discogram revealed no herniation, central canal stenosis or significant foraminal stenosis (Tr. 76). Plaintiff was diagnosed with diffusely degenerative discs at the L2-3, L3-4, L4-5, and L5-S1 levels (Tr. 76). However, the examining physician was unable to reproduce Plaintiff's baseline symptoms (Tr. 76). Likewise, Plaintiff's right anterior thigh pain "was not associated with provocative discogram at any one level despite initial discogram and retesting" (Tr. 76).

Dr. J.W. Markworth examined Plaintiff in February, 2000 (Tr. 113). He diagnosed Plaintiff with degenerative discs and segmental instability (Tr. 113). Dr. Markworth opined

7

that Plaintiff's rehabilitation potential was fair (Tr. 113). A treatment plan including moist heat and therapy exercises was prescribed (Tr. 113). During therapy sessions in February, 2000, it was noted that Plaintiff was progressing and that his activities had increased (Tr. 111). On February 28, 2000, Paul R. Murphy–a physical therapist–stated that Plaintiff had been able to progress in various reconditioning and lumbar stabilization exercises (Tr. 110). However, Plaintiff's pain level had not improved (Tr. 110). When Plaintiff returned in June, 2001 he voiced no major complaints (Tr. 106). Furthermore, although Plaintiff canceled several physical therapy sessions for various reasons, during later sessions in June, 2001 Plaintiff tolerated his physical therapy exercises well (Tr. 100). Mr. Murphy indicated on June 22, 2001 that Plaintiff "continue[d] to have up and down episodes with his lower back" (Tr. 98). Plaintiff continued to tolerate his physical therapy exercises well (Tr.98). On June 29, 2001, it was indicated that Plaintiff continued to progress in his activities and was doing well (Tr. 96). Throughout July, 2001 Plaintiff tolerated his physical therapy exercises well (Tr. 89-94). Plaintiff was diagnosed with lower back dysfunction on August 3, 2001 (Tr. 80). It was noted that Plaintiff's activities had increased after completing his physical therapy regimen (Tr. 80).

On August 7, 2001 Plaintiff underwent an evaluation of his residual functional capacity ("RFC")(Tr. 115-122). Plaintiff indicated on a questionnaire that he was capable of: 1) doing his laundry; 2) carrying feed for his animals which weighed approximately 25 pounds; 3) shopping for groceries; and 4) walking, sitting and standing for more than 30 minutes without having to take a break (Tr. 118). Nonetheless, Dr. Markworth opined that

8

Plaintiff had: 1) a 10% interference in activities of daily living; 2) a 100% interference in work and leisure activities; and 3) a 10% interference in anxiety and depression (Tr. 118). On a scale of zero to ten, Plaintiff rated his pain between four and six (Tr. 118). Strength testing indicated that Plaintiff could occasionally carry 30 pounds and frequently carry 15 pounds (Tr. 119). In addition, the strength testing also indicated that Plaintiff could push or pull 140 pounds occasionally and 70 pounds frequently (Tr. 119). Plaintiff was able to bend, reach, climb and squat (Tr. 119). Furthermore, Plaintiff was able to: 1) stand for 18 minutes; 2) sit for 20 minutes; and 3) walk for 16 minutes (Tr. 119-120). Based on these results, Dr. Markworth indicated that: 1) Plaintiff did not have the physical capabilities perform his past relevant work; 2) physical reconditioning exercises had helped Plaintiff significantly and should be continued; and 3) Plaintiff should initiate a job search (Tr. 121-122).

Plaintiff was examined by Dr. Alan Jackson on April 21, 2003 after Plaintiff developed an acute onset of painless swelling in his left leg (Tr. 123). He was diagnosed with acute deep venous thrombosis and chronic back syndrome (Tr. 123). Furthermore, Plaintiff was "admitted to Cape Fear Memorial Hospital and started on a course of intravenous heparin and subsequently coumadinized" (Tr. 123). After this treatment Plaintiff's leg swelling defervesced, and Plaintiff ambulated without significant problems during the course of the hospitalization (Tr. 123). Plaintiff was discharged on a course of Coumadin (Tr. 123).

Dr. Markworth examined Plaintiff on December 8, 1999 (Tr. 144). During this examination, Plaintiff had a normal gait and was also able to walk on his tiptoes and his heels

(Tr. 144). X-rays of Plaintiff's spine were normal with fairly well-maintained disc space heights (Tr. 144). Plaintiff was diagnosed with sciatica and started on a course of anti-inflammatory agents (Tr. 144). It was noted that although Plaintiff's condition was not worsening it had reached a plateau with regard to improvement (Tr. 144). In January, 2000 Plaintiff reported that his symptoms had not improved (Tr. 142-143). However, a review of an MRI scan showed normal alignment with no significant disc bulging or herniation (Tr. 142). Dr. Markworth opined that Plaintiff was experiencing discogenic pain secondary to disc degeneration along with possible irritation of the nerve roots without actual compression (Tr. 142). Plaintiff was given Elavil to treat this condition and was instructed to return to work in two weeks (Tr. 142). On February 9, 2000, Plaintiff indicated that his leg pain had improved significantly (Tr. 141). A regimen of physical therapy was prescribed for Plaintiff (Tr. 141). After participating in physical therapy for about two weeks, Plaintiff stated that his symptoms had worsened (Tr. 141). Dr. Markworth examined Plaintiff again on June 7, 2000 (Tr. 140). No significant relief was reported by Plaintiff after he underwent two epidural injections (Tr. 140). On October 31, 2000, Dr. Markworth indicated that Plaintiff's symptoms were essentially unchanged (Tr. 137). During a examination conducted on January 26, 2001, Plaintiff reported that his pain was worsening (Tr. 136). Dr. Markworth noted that Plaintiff would remain off work (Tr. 136). On April 25, 2001, Dr. Markworth stated that Plaintiff's condition remained essentially unchanged (Tr. 135). He recommended that Plaintiff undergo a lumbar stabilization exercise program (Tr. 135). Ultimately, Dr. Markworth's impression was that Plaintiff continued to suffer from discogenic pain on

10

multiple levels of the lumbar spine (Tr. 135). Plaintiff continued to report back pain during a examination on August 21, 2001 (Tr. 131). However, Plaintiff did state that stretching exercises helped his leg pain and burning (Tr. 131). During this examination, Dr. Markworth informed Plaintiff that Plaintiff's "actual impairment rating is rather low compared to what the disability might entail" (Tr. 131). Dr. Markworth further indicated that Plaintiff would require chronic medication for pain (Tr. 131). However, Dr. Markworth also stated that Plaintiff could undergo training to assist him in continuing to work despite his restrictions (Tr. 131). On August 28, 2001, Dr. Markworth opined that Plaintiff had reached maximal medical improvement (Tr. 130). Furthermore, Plaintiff was estimated to have an 8% permanent partial impairment of his back based on discogenic back pain (Tr. 130). Dr. Markworth conducted an orthopedic evaluation of Plaintiff on September 1, 2004 (Tr. 128-129). During this examination, Plaintiff complained of back pain, nerve damage and right leg pain (Tr. 128). Upon examination, Plaintiff was in no apparent discomfort and had a normal gait (Tr. 129). Plaintiff was able to walk on his tiptoes and his heels (Tr. 129). In addition, his back was straight (Tr. 129). Flexion was limited to about 15 degrees in each direction secondary to discomfort at the lumbosacral junction (Tr. 129). In addition, Plaintiff had discomfort to palpation at the lumbosacral junction and to about L4 at the midline (Tr. 129). Likewise, he had tenderness over the sacroiliac joint on the right side and in the sciatic notch on the left side (Tr. 129). Ultimately, Dr. Markworth determined that Plaintiff had multiple level disc degeneration with annular tears and mechanical pain (Tr. 129). He suggested that Plaintiff be restricted from prolonged sitting, and that Plaintiff could not do

11

anything that would require bending, twisting, standing or walking on a prolonged basis (Tr. 129). Furthermore, Dr. Markworth opined that Plaintiff would have to change positions periodically and perhaps even spend some time lying down intermittently throughout the day (Tr. 129). Dr. Markworth also stated that "[o]n some days [Plaintiff's] pain might be so severe that he cannot concentrate or deal with others" (Tr. 129). Finally, Dr. Markworth noted that Plaintiff should avoid any lifting greater than 20 pounds as well as exposure to vibrations (Tr. 129).

On September 21, 2004 Plaintiff underwent an evaluation of his physical RFC (Tr. 145-152). It was determined that Plaintiff was capable of: 1) occasionally lifting and/or carrying 20 pounds; 2) frequently lifting and/or carrying 10 pounds; 3) sitting (with normal breaks) for a total of about six hours in an eight-hour workday; and 4) pushing and/or pulling with no limitations other than as shown for lifting and/or carrying (Tr. 146). In addition, Plaintiff was deemed capable of frequently: 1) climbing; 2) balancing; 3) stooping; 4) kneeling; 5) crouching; and 6) crawling (Tr. 147). No manipulative, visual, or communicative limitations were established (Tr. 148-149). No environmental limitations were noted other than Plaintiff was to avoid concentrated exposure to vibrations (Tr. 149).

Another evaluation of Plaintiff's RFC was conducted on March 22, 2005 (Tr. 153-160). It was determined that Plaintiff was capable of: 1) occasionally lifting and/or carrying 20 pounds; 2) frequently lifting and/or carrying 10 pounds; 3) standing and/or walking (with normal breaks) about six hours in an eight hour workday; 4) sitting (with normal breaks) for a total of about six hours in an eight hour workday; and 5) pushing and/or pulling with no

limitations other than as shown for lifting and/or carrying (Tr. 154). In addition, Plaintiff was deemed capable of occasionally climbing and balancing as well as frequently kneeling, crouching, and crawling (Tr. 155). No manipulative, visual, or communicative limitations were established (Tr. 156-157). No environmental limitations were noted other than Plaintiff was to avoid concentrated exposure to noise (Tr. 157). However, remarks contained in the evaluation suggest that the examiner intended to report that Plaintiff should avoid concentrated exposure to vibrations rather than noise (Tr. 159).

Dr. Jackson evaluated Plaintiff's RFC on November 16, 2005 (Tr. 161-164). He determined that Plaintiff could: 1) lift less than ten pounds; 2) stand and walk (with normal breaks) less than two hours during an eight hour day; and 3) sit (with normal breaks) less than two hours during an eight hour day (Tr. 161-162). Furthermore, Dr. Jackson opined that Plaintiff could sit and/or 20 minutes before changing position (Tr. 162). Plaintiff would need the opportunity to shift at will from sitting to standing/walking (Tr. 162). In addition, Dr. Jackson stated that Plaintiff would need to lie down at unpredictable intervals during a work shift (Tr. 162). According to Dr. Jackson, Plaintiff could never twist, stoop, crouch, climb ladders, or push and/or pull (Tr. 163). Finally, Dr. Jackson anticipated that Plaintiff's impairments would cause him to be absent from work more than four days a month (Tr. 164).

On September 13, 2001, Plaintiff was examined by a physician's assistant (Tr. 221-222). He was described as a moderately obese white male who was not in acute distress (Tr. 221). Plaintiff had negative straight leg raise and his range of motion was intact (Tr. 221). His motor strength was 5/5 (Tr. 221). Dr. Jackson examined Plaintiff again on January 25,

2002 and stated that Plaintiff was doing "fairly well" (Tr. 212). Plaintiff still had continued back problems with radiculopathy down the right leg (Tr. 212). His power, reflexes, and tone were all unremarkable (Tr. 212). He was advised to lose weight (Tr. 212). On February 19, 2002, was examined again (Tr. 211). Dr. Jackson reiterated that Plaintiff had a history of hypertension and chronic back pain with radiculopathy (Tr. 211). Furthermore, Dr. Jackson diagnosed Plaintiff with lumbar spondylosis, discogenic disease of the back, and hypertension (Tr. 211). On April 16, 2002 Plaintiff was diagnosed with: 1) chronic back pain; 2) cervical spondylosis; 3) hypertension; and 4) exogenous obesity (Tr. 210). Dr. Jackson stated on June 24, 2002 that Plaintiff was "doing well" and a review of Plaintiff's symptoms was entirely unremarkable (Tr. 208). However, Plaintiff still complained of back pain which radiated down both legs (Tr. 208). Again on October 10, 2002, a review of Plaintiff's systems was unremarkable, although Plaintiff continued to have back problems (Tr. 206). His power, reflexes and tone were also unremarkable (Tr. 206). Plaintiff reported on November 7, 2002 that he was feeling well, although cold weather was causing his back pain to worsen (Tr. 205). He was diagnosed with: 1) chronic back pain secondary to annular disc tear; 2) hypertension; 3) hypertriglyceridemia; and 4) sleep apnea (Tr. 205). Again on December 6, 2002, Plaintiff stated that he was feeling well other than cold weather causing his back pain to worsen (Tr. 204). On January 21, 2003, Dr. Jackson stated that Plaintiff was "doing wonderfully" and that Plaintiff's back was significantly improved (Tr. 203). Plaintiff had no particular complaints (Tr. 203). Plaintiff was admitted to New Hanover Regional Medical Center on May 20, 2003 when he developed acute onset of painless swelling in his

14

left leg (Tr. 200). He was diagnosed with acute deep venous thrombosis and chronic back syndrome and started on a course of intravenous heparin and subsequently coumadinzied (Tr. 200). Dr. Jackson stated on April 29, 2003 that Plaintiff's back was "holding stable" (Tr. 197). On May 7, 2003, Plaintiff was walking better and his calf was less tender, swollen and irritated (Tr. 196). Nonetheless, Dr. Jackson opined that Plaintiff's deep vein thrombosis had not completely resolved (Tr. 196). During a follow up on May 16, 2003, Dr. Jackson diagnosed Plaintiff with persistent deep vein thrombosis, and Plaintiff was instructed "in no uncertain terms to keep off the leg . . ." (Tr. 194). However, on June 13, 2003, Dr. Jackson stated that Plaintiff was "doing well" and that Plaintiff was "having no particular problems" (Tr. 193). Likewise, a review of Plaintiff's symptoms was unremarkable and Dr. Jackson's impression was that Plaintiff was medically stable (Tr. 193). A MRI of the lumbar spine without contrast on July 7, 2003 revealed mild-moderate loss of disc space height L3-L4 and L4-L5 with bulging of the disc at each level (Tr. 190). The MRI demonstrated "no evidence of disc herniation or significant central, recess or foraminal stenosis" (Tr. 190). Dr. Jackson stated on July 11, 2003 that Plaintiff was doing better overall (Tr. 189). On September 11, 2003, Dr. Jackson stated that Plaintiff was "medically improved, medically stable" (Tr. 184). According to Dr. Jackson, Plaintiff's deep vein thrombosis was resolved as of October 3, 2003, although it then recurred on November 10, 2003 (Tr. 182-183). Plaintiff was diagnosed with: 1) recurrent deep vein thrombosis; 2) chronic back syndrome; 3) hyperlipidemia; 4) obesity; and 5) glucose impairment on November 10, 2003 (Tr. 182). By November 24, 2003, however, Dr. Jackson opined that the deep vein thrombosis had resolved

15

again (Tr. 181). Upon examination on May 4, 2004, Plaintiff's systems were entirely unremarkable, and it was noted that Plaintiff had no particular problems (Tr. 176). Similarly, Dr. Jackson stated that Plaintiff was doing well (Tr. 176). On July 22, 2004 Dr. Jackson stated that Plaintiff was doing fairly well, although Plaintiff was still diagnosed with: 1) chronic back pain; 2) hypertension; 3) moderate obesity; and 4) deep vein thrombosis by history (Tr. 174). Dr. Jackson on April 6, 2005 stated that Plaintiff had limited functional abilities and that Plaintiff's weight continued to increase (Tr. 170). A review of Plaintiff's symptoms was still highly unremarkable (Tr. 170). He was diagnosed with: 1) uncontrolled hypertension; 2) exogenous obesity; 3) chronic back pain; 4) depression of chronic disease; and 5) acid reflux disorder by history (Tr. 170). Dr. Jackson stated on August 3, 2005 that Plaintiff was doing well and that Plaintiff was in no apparent distress (Tr. 169). On October 17, 2005, Dr. Jackson noted that Plaintiff's weight continued to increase and that cold weather was causing some problems with Plaintiff's back (Tr. 167). Plaintiff was deemed exogenously obese and was advised to lose weight (Tr. 167). Finally, on February 3, 2006, Dr. Jackson stated that Plaintiff was "doing well at this point in time" and that Plaintiff's "back is under fairly good control at this time" (Tr. 165). Dr. Jackson's impression was that Plaintiff was medically stable (Tr. 165).

During the hearing in this matter, Plaintiff testified that he suffered from problems in his back and neck (Tr. 274). Pain in these area limited his mobility and affected his ability to work (Tr. 274). He stated that this pain starts in his lower back and radiates down to his right leg (Tr. 274). Because of his pain, Plaintiff alleged that he had difficulty sleeping (Tr.

274-274).  Plaintiff stated that he did not suffer any side effects from the medications he was taking (Tr. 278).  Furthermore, Plaintiff testified that his blood pressure was well controlled by his medication (Tr. 278).  His sleep apnea was resolved with a CPAP machine (Tr. 281).  He also indicated that he had not experienced any deep vein thrombosis in approximately two or three years (Tr. 281).  However, Plaintiff did note that he still experiences swelling in his legs (Tr. 281-282).  Plaintiff indicated that he was still capable of occasionally cooking and washing clothes (Tr. 287).  In addition, Plaintiff stated he was able to occasionally go shopping with his wife (Tr. 288).  Conversely, Plaintiff also added that sometimes he has "bad days" and does not leave the house (Tr. 288).  Specifically, Plaintiff testified that there have been times when he did not leave the house for up to three days because of his pain (Tr. 288).  He also alleged that he was still suffering residual swelling and edema from his resolved deep vein thrombosis (Tr. 290).  To alleviate the swelling in his legs, Plaintiff has to elevate his legs (Tr. 293).  According to Plaintiff, he is no longer able to fish, play tennis, or shoot pool (Tr. 291).  With regard to his previous employment, Plaintiff stated that he would be required to lift up to 100 pounds on a regular basis (Tr. 292).  Even when he is having a "good day", Plaintiff alleged that he spent approximately three or four hours in a recliner (Tr. 295).

With regard to Plaintiff's testimony, the ALJ made the following observations:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

Although the claimant has received various forms of treatment for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been generally successful in controlling those symptoms. Specifically, a treatment record from February 3, 2006 noted the claimant is doing well and is medically stable; multiple reports describe the claimant as being in no apparent distress (For example, October 27, 2005, April 6, 2005, and November 2002); a treatment record from January 21, 2003 described the claimant as feeling wonderfully [Tr. 165-264].

The claimant's treatment history has been fairly conservative. However, he has reported that his blood pressure is controlled by medications and his sleep apnea is controlled by his CPAP machine.

While the claimant testified that a fusion has been recommended for his back problems, there is no documentation of this in the record. Further, there is no documentation of significant treatment for his back pain, including, but not limited to physical therapy, visits to a pain clinic, or steroid injections during the relevant period. This apparent lack of treatment detracts from the claimant's credibility regarding the extent of his symptoms and limitations.

His activities of daily living include helping with housework, loading the dishwasher, some folding of clothes, and some shopping, which are not limited to the extent one would expect given his complaints of disabling symptoms and limitations.

The claimant has not alleged any side effects from his medications . . .

 . . . I has considered the medical opinions of the claimant's treating physicians, evaluating physicians, and the state agency medical consultants. I have specifically considered the treating physician's Residual Functional Capacity of November 16, 2005 and the consultative examiner's assessment of September 1, 2004, but accord them little weight as they are not supported by the evidence of record . . . For example, the consultative examiner's opinion is not supported by . . . his own observations on examination that the claimant was in no apparent discomfort, had a normal gait, was able to walk on his tiptoes/heels, and had a straight back. Similarly, records from the treating physician, as noted above, also do not support the conclusions reached by these physician[s]. For example, records from Dr. Alan Jackson reported that the claimant was in no apparent distress. A treatment note from August 2005

18

found the claimant to have a negative straight leg raise and no loss of power, reflexes, or tone. An April 6, 2005 record noted complaints of intermittent lower extremity swelling but no swelling on examination, with some pedal edema noted on this April, 29, 2003 and May 7, 2003 examinations, which was gone by the May 15, 2003 examination [Tr. 165-264].

Regarding the medical opinions of the DDS medical consultants, I accord them significant weight as their opinions are generally consistent with the other evidence of record.

The record documents that the claimant suffers from lumbar/cervical spine degenerative joint disease, sleep apnea, obesity, hypertension, venous insufficiency, and a history of deep vein thrombosis. I do not find the claimant full credible regarding the extent of his subjective complaints, especially considering his inability to sit or stand for any period of time, in light of his fairly conservative medical treatment. I do not accord controlling weight to the assessments of Dr. Markworth and Dr. Jackson regarding the claimant's physical capabilities. . . .
(Tr. 19-20).

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions through step four of the sequential evaluation. The ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for her resolutions of conflicts in the evidence. However, the ALJ erred in not calling a vocational expert during the final step of the sequential evaluation. The undersigned shall now specifically address Plaintiff's individual assignments of error.

**The ALJ gave proper weight to Plaintiff's treating physicians**

Plaintiff contends that the ALJ inappropriately disregarded the opinions of Plaintiff's treating physicians. It is the ALJ's responsibility to weigh the evidence, including the

medical evidence, in order to resolve any conflicts which might appear therein. Wireman v. Barnhart, 2006 WL 2565245 (Slip Op. at 8)(W.D.Va. 2006)(internal citations omitted). Furthermore, "while an ALJ may not reject medical evidence for no reason or the wrong reason . . .an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings." *Id.* (internal citations omitted).

While "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam). Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 166 F.3d 1209 (4th Cir.1999) (unpublished opinion)(internal citations omitted).

The ALJ determined that Plaintiff had the RFC to perform light work, adding that Plaintiff should avoid concentrated exposure to extreme vibration (Tr. 18). Two physicians

opined that Plaintiff was unable to perform work at the this level. The ALJ did not give controlling weight to either opinion (Tr. 19-20). Specifically, the ALJ discounted Dr. Markworth's opinion because it was internally inconsistent and inconsistent with other evidence in the record. Likewise, the ALJ discounted Dr. Jackson's opinion because it was not consistent with his extensive treatment notes. These reasons were supported by substantial evidence and, therefore, this assignment of error is meritless.

**The ALJ properly addressed Plaintiff's alleged obesity**

Plaintiff alleges that the ALJ failed to consider the fact that Plaintiff is obese. The undersigned disagrees. Here, the ALJ determined that Plaintiff's impairments, singly or in combination, did not meet or equal the level of severity described for any listed impairment (Tr. 17). Plaintiff's obesity was analyzed in detail by the ALJ (Tr. 17-18). The ALJ's analysis was supported by substantial evidence in the record. Accordingly, this assignment of error is also meritless.

**The ALJ properly assessed Plaintiff's credibility**

Plaintiff assigns error to the ALJ's determination regarding the credibility of Plaintiff's testimony. The ALJ's findings with regard to Plaintiff's subjective complaints have already been summarized. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The ALJ's findings of fact demonstrate that the ALJ gave proper weight to all of Plaintiff's limitations and impairments in assessing Plaintiff's credibility. Likewise, the

21

ALJ's citations to Plaintiff's medical records constitute substantial evidence which support her assessment.  Accordingly, this assignment of error is meritless.

## E.  The ALJ erred in not calling a vocational expert

In the instant matter, the ALJ used the medical-vocational guidelines ("Grids") to determine that there were jobs in the national economy which Plaintiff could perform.  If a claimant has no nonexertional impairments that prevent him from performing the full range of work at a given exertional level, the Commissioner may rely solely on the Grids to satisfy his burden of proof.  Coffman v. Bowen, 829 F.2d 514, 518 (4th Cir. 1987); Gory v. Schweiker, 712 F.2d 929, 930-31 (4th Cir. 1983).  However, the Grids are dispositive of whether a claimant is disabled only when the claimant suffers from purely exertional impairments.  Aistrop v. Barnhart, 36 Fed. Appx. 145, 146 (4th Cir. 2002)(unpublished opinion).  To the extent that nonexertional impairments further limit the range of jobs available to the claimant, the Grids may not be relied upon to demonstrate the availability of alternate work activities.  Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).  Rather, when a claimant suffers from both exertional and nonexertional limitations, the Grids are not conclusive but may only serve as a guide.  Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989)(citing Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984)).  A nonexertional limitation is a "limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not . . . [s]uch limitations are present at all times in a claimant's life, whether during exertion or rest."  Woody v. Barnhart, 326 F. Supp.2d 744, 752 (W.D.Va. 2004)(quoting Gory 712 F.2d at 930)).  Typically, they are conditions such as

mental disorders, environmental intolerances, substance addictions, or sensory impediments.

*Id.* (*citing* 20 C.F.R. § 1569a, SSR 96-8p; and Walker, 889 F.2d at 48-49 (4th Cir. 1989)).

Furthermore "[a] non-exertional limitation is one that places limitations on functioning or

restricts an individual from performing a full range of work in a particular category."

Aistrop, 36 Fed. Appx. at 147(*citing* Gory, 712 F.2d at 930).   However, not every

nonexertional limitation or malady rises to the level of nonexertional impairment, so as to

preclude reliance on the Grids.  Walker, 889 F.2d at 49 (*citing* Grant,699 F.2d at 189).  The

proper inquiry is whether the nonexertional condition affects an individual's RFC to perform

work of which he is exertionally capable.  *Id.*  When a claimant suffers from nonexertional

limitations, the Commissioner must produce a VE to testify that the particular claimant

retains the ability to perform specific jobs which exist in the national economy.  Grant, 699

F.2d at 192 (*citing* Taylor v. Weinberger, 512 F.2d 664 (4th Cir. 1975)).

> Here, the ALJ determined:
>
>> . . . through the date last insured, the claimant had the residual functional
>> capacity to perform light, unskilled work not involving concentrated exposure
>> to extreme vibration.
>> (Tr. 18).

Thus, Plaintiff's  RFC was clearly limited by an environmental intolerance (Tr. 18).   As

such, Defendant was required to produce the testimony of a VE to meet its burden at step five

of the sequential evaluation.  Grant, 699 F.2d at 192.

## Conclusion

For the reasons discussed above, it is HEREBY RECOMMENDED that Plaintiff's

Motion for Judgment on the Pleadings [DE-14] be DENIED IN PART AND GRANTED IN PART, and that Defendant's Motion for Judgment on the Pleadings [DE-20] be DENIED IN PART AND GRANTED IN PART. Specifically, the undersigned finds that substantial evidence supports each of Defendant's findings through step four of the sequential analysis. Therefore, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings be DENIED and Defendant's Motion for Judgment on the Pleadings be GRANTED with regard to all aspects of Defendant's decision through step four of the sequential evaluation. However, because Defendant failed to provide the testimony of a VE at step five of the sequential analysis, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings be GRANTED and Defendant's Motion for Judgment on the Pleadings be DENIED with regard to Defendant's finding at step five that Plaintiff could perform other jobs found in the national economy. Therefore, it is RECOMMENDED that this matter be remanded to obtain the testimony of a VE at step five to determine whether Plaintiff retains the ability to perform specific jobs which exist in the national economy. Walker, 889 F.2d at 50.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 17th day of November, 2008.

_____
William A. Webb
U.S. Magistrate Judge